## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **WILLIAM HENRY VAN PELT, IV,** | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. _____ |
| | § | |
| **THE BALDWIN GROUP WEALTH** | § | |
| **ADVISORS, LLC,** | § | |
| *Defendant.* | § | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, WILLIAM HENRY VAN PELT, IV ("Plaintiff"), files his Complaint for Defamation, against Defendant THE BALDWIN GROUP WEALTH ADVISORS, LLC ("Defendant"), and alleges as follows:

## INTRODUCTION

1. Plaintiff is a long-tenured financial services professional whose career depends on trust, regulatory standing, and the ability to form and maintain client and industry relationships.

2. Defendant terminated Plaintiff and then filed a Form U5 containing false misconduct language that was published through industry databases, including BrokerCheck™, to prospective employers, clients, and counterparties.

3. Defendant's Form U5 language did more than harm Plaintiff's reputation; it predictably disrupted Plaintiff's ability to obtain new employment or affiliations and to pursue ongoing and future business opportunities in the regulated financial-services marketplace.

4. Defendant's publication also disparaged Plaintiff's business and economic interests by conveying that Plaintiff could not be trusted to handle assets or comply with professional

1

standards—statements that directly undermine the commercial value of Plaintiff's services and the goodwill associated with his businesses.

5.    This action seeks damages for defamation, tortious interference with prospective business relations, and business disparagement, and it also seeks equitable relief requiring Defendant to correct the U5 termination disclosure so Plaintiff's public registration record no longer reflects false misconduct allegations.

## THE PARTIES

1.  Plaintiff William Henry Van Pelt, IV is an individual and a citizen of Harris County, Texas.

2.  The Baldwin Group Wealth Advisors, LLC is a limited liability company organized and existing under the laws of the State of Florida. Defendant has been and is doing business in the State of Texas. Defendant may be served with process under the Texas Long-Arm Statute, by serving the Texas Secretary of State who will mail the process to Defendant at its home office address and principal place of business. Defendant's home office address and principal place of business is at 4211 W. Boy Scout Boulevard, Suite 800, Tampa, Florida 33607.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction under 28 U.S.C. § 1332 because Plaintiff is not a citizen of the same state as the Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.  Venue is proper in this division and district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in Houston Division of the Southern District of Texas.

## FACTUAL ALLEGATIONS

**A. The Parties' Relationship and the Mid-Continent Account**

5.  Plaintiff is President of Mid-Continent Companies, Ltd. (hereinafter, "Mid-Continent"), which is part of a group of entities providing diverse financial services nationally.

6. In or around April 2021, Plaintiff, as an independent contractor, formed business relationships with Defendant and its affiliates, including Insgroup, LLC (hereinafter, "Insgroup"), a wholly-owned subsidiary of Defendant's parent company, The Baldwin Group.

7.  In October 2021, Plaintiff joined Defendant as an investment adviser representative in Houston, Texas.

8.  Since 2015, Mid-Continent has been appointed with Guardian Life Insurance Company of America for the sale of Guardian's insurance products.

9.  Defendant has no involvement with the management of Mid-Continent and has never owned Mid-Continent.

10. Mid-Continent owns and controls a bank account (hereinafter, "Mid-Continent Account") that has always been the sole property of Mid-Continent.

11. At no time has Defendant had authority over, permission to use, or ownership of the Mid- Continent Account.

**B.  The Misdirected Payments**

12. On or about August 16, 2023, unbeknownst to Plaintiff or Mid-Continent, Houston-based personnel of Insgroup instructed Guardian to establish a direct deposit relationship with the Mid- Continent Account for the payment of commissions associated with a newly-created Insgroup producer identification number.

13. The Insgroup producer identification number related to business written by an Insgroup salesperson who never had any business relationship with Plaintiff or Mid-Continent.

14. Neither Plaintiff nor Mid-Continent had knowledge of the existence of this Insgroup salesperson, the Insgroup producer identification number, or the instructions given by Insgroup to Guardian to establish a direct deposit relationship with the Mid-Continent Account.

15. Between November 2024 and February 2025,  as instructed by Insgroup, Guardian transferred three separate Automated Clearing House payments totaling $793,521.33 to the Mid-Continent Account (hereinafter, "Misdirected Payments").

16. The business relationships between Plaintiff, Defendant, The Baldwin Group, and Insgroup were solidified through a series of transactions (hereinafter, the "April 2021 Closing").

17. During due diligence before the April 2021 Closing, The Baldwin Group and Insgroup learned the bank and account number of a Mid-Continent bank account (the mid-continent account), which Plaintiff alleges was solely owned and controlled by Mid-Continent and was not used for business between Plaintiff and Defendant.

18. The Misdirected Payments were commission payments due to Insgroup from Guardian in connection with business that was unrelated to Mid-Continent or Plaintiff.

19. The Misdirected Payments were caused by Insgroup's inappropriate and unauthorized use of the Mid-Continent Account.

20. The months of November 2024, January 2025, and February 2025 were all months in which Mid-Continent typically receives large insurance commissions.

21. Mid-Continent's accounting staff had a sound basis to believe that the received funds were commissions due to Mid-Continent in the ordinary course of business and no reason to associate activity in the Mid-Continent Account with any third party.

22. Plaintiff does not work in the accounting department of Mid-Continent and does not monitor the Mid-Continent Account.

23. Plaintiff was unaware of the Misdirected Payments and the fact that the funds had been erroneously transferred into the Mid-Continent Account.

**C. Plaintiff's Good Faith Efforts to Return the Funds**

24. In or around early May 2025, Insgroup's Houston-based finance director, Brett Todd, notified Plaintiff via phone that Insgroup was trying to locate funds due to it from Guardian and that he suspected Guardian had incorrectly sent the Misdirected Payments to Mid-Continent.

25. Mr. Todd requested that Plaintiff investigate the possibility within Mid-Continent.

26. Shortly thereafter, Plaintiff informed Mr. Todd that the Misdirected Payments had been received by Mid-Continent.

27. Plaintiff asked for a date by which Mr. Todd needed the matter to be corrected.

28. Mr. Todd stated that he needed the matter corrected by August 2025.

29. Plaintiff and Mr. Todd agreed to work to return the Misdirected Payments by July 31, 2025.

30. Plaintiff promptly began efforts to return the Misdirected Payments to Guardian and consistently communicated his intent to restore the funds to the appropriate payer.

31. Plaintiff repeatedly attempted to obtain information from Guardian related to the Misdirected Payments.

32. Guardian informed Plaintiff in writing that it could not assist him with the return of the Misdirected Payments unless he could provide the producer identification number, clients, or client contract number associated with the Misdirected Payments.

33. Because Plaintiff had no knowledge of the Insgroup producer identification number, any clients or Guardian contracts related to the Insgroup producer identification number, or the

fact that Insgroup had associated the Insgroup producer identification number with the Mid-Continent Account, Guardian could not identify the Misdirected Payments in its system.

34. Based upon Plaintiff's decades-long experience in banking, accounting, and auditing processes, Plaintiff believed that Mid-Continent needed to return the Misdirected Payments to the originator of the transfers: Guardian.

35. Plaintiff contacted the head of Guardian's legal department in its New York City headquarters.

36. Guardian's legal department engaged an operations manager possessing access to different databases than those available to the customer service department.

37. The operations manager determined that Insgroup and The Baldwin Group had incorrectly informed Guardian that it had acquired Mid-Continent and the Mid-Continent Account.

38. Consequently, when The Baldwin Group contacted Guardian regarding its outstanding commissions, Guardian believed that The Baldwin Group needed to retrieve the funds from its subsidiary, Mid-Continent, and Mid-Continent's bank account.

### D. Defendant's Threats and Termination of Plaintiff

39. On or about August 1, 2025, Brian Kapiloff, former president and CEO of Insgroup and current southwest region president of The Baldwin Group, called Plaintiff and demanded that the Misdirected Funds be sent by Mid-Continent to The Baldwin Group immediately.

40. Plaintiff informed Mr. Kapiloff that he was communicating with Guardian regarding the matter and that the Misdirected Payments would be returned to Guardian.

41. On August 13, 2025, Defendant sent Plaintiff a letter demanding the immediate return of the Misdirected Payments to Defendant. A true and accurate copy of the letter sent to Plaintiff by Defendant is attached hereto as *Exhibit A* and incorporated herein by reference.

42. The letter grossly misrepresented the facts and conspicuously omitted any fault whatsoever on the part of Defendant.

43. The letter threatened that if Plaintiff did not pay the amount in full with interest by August 30, 2025, Defendant would initiate legal action to recover the funds, along with any interest, costs, and attorneys' fees.

44. On or about August 22, 2025, in an effort to be fully transparent, Plaintiff wrote to Defendant providing an update on the progress with Guardian, stating: "I have communicated with Guardian this week regarding this matter. I will have a follow up call with Guardian early next week and will reach out to you as soon as I have information to share." A true and accurate copy of the communication sent by Plaintiff to Defendant providing updates is attached hereto as *Exhibit B* and incorporated herein by reference.

45. From May 2021 through September 8, 2025, Plaintiff and his associates functioned as a highly-productive employee benefits consulting team with Defendant and its affiliates.

46. Defendant had a significant business relationship with Plaintiff and had every reason to know that Mid-Continent intended to return the Misdirected Funds to their originator.

47. On September 8, 2025, despite Plaintiff's numerous updates and ongoing communication with Defendant, Defendant notified Plaintiff that his association with Defendant was terminated, effective immediately.

**E. The False and Defamatory Form U5**

48. On or about September 17, 2025, Defendant filed a Form U5 termination disclosure with FINRA stating that Plaintiff had been "discharged" on September 8, 2025.

49. The allegations published in connection with the termination disclosure state:

> The Independent Contractor failed to perform all Services in accordance with 'all Applicable Laws' and in compliance with Baldwin's company policies, including

specifically its Code of Business Conduct and Ethics policy which requires persons to 'act with honesty and integrity and in full compliance with all applicable laws, rules and regulations' and to protect company assets 'against loss, theft or other misuses.'

A true and accurate copy of Plaintiff's BrokerCheck™ record depicting the termination disclosure submitted by Defendant is attached hereto as *Exhibit C* and incorporated herein by reference.

50. The Form U5 allegations are false.

51. Plaintiff did not fail to perform any services in accordance with applicable laws or company policies.

52. Plaintiff did not engage in any improper conduct.

53. Plaintiff never had personal possession of the Misdirected Payments.

54. The Misdirected Payments did not arise out of any alleged action on the part of Plaintiff.

55. The Misdirected Payments were caused by Defendant's affiliates and their inappropriate, unauthorized use of the Mid-Continent Account.

56. Defendant's actions stemmed from its insistence that the Misdirected Payments be sent directly from Mid-Continent to The Baldwin Group, bypassing the originator of the transfers, Guardian.

57. The dispute regarding how to handle the Misdirected Payments was internal between Plaintiff and The Baldwin Group and did not involve any customer accounts or complaints by customers.

58. The alleged misconduct was not investment-related.

59. On or about October 8, 2025, the Misdirected Payments were sent by Mid-Continent to Guardian, consistent with Guardian's position that the funds should be returned to the sender.

60. Plaintiff's Form U5 disclosure has resulted in no regulatory action nor sanction by any regulatory authority.

**F. Publication and Harm**

61. The Form U5 disclosure is published on Plaintiff's Central Registration Depository record and is publicly accessible via BrokerCheck™, Investment Adviser Public Disclosure, and related registration databases maintained by FINRA.

62. Any prospective employer, client, vendor, counterparty, regulator, or member of the public can view the disclosure.

63. BrokerCheck™ is prominently linked on professional profiles.

64. Following Plaintiff's termination and the publication of the Form U5 disclosure, Plaintiff has experienced tremendous difficulty securing new customers and other business relationships in the financial services industry.

65. Plaintiff has experienced extreme financial hardship due to the income lost as a result of the language on his Form U5 filing.

66. Prior to the Form U5 disclosure, Plaintiff had no issues securing beneficial industry relationships.

67. The false accusations of dishonesty and asset misuse have severely damaged Plaintiff's professional reputation, compromised his business's commercial appeal, and will continue to cause ongoing harm.

68. The false public accusations of dishonesty and ethical violations have effectively blacklisted Plaintiff within the regulated securities industry.

**G. Defendant's Knowledge and Malice**

69. Defendant knew the allegations in the Form U5 were false because Defendant's own affiliate caused the Misdirected Payments through unauthorized direct-deposit instructions.

70. Defendant notified Plaintiff of the erroneous deposits.

71. Plaintiff promptly acknowledged the issue and promised to return the funds to Guardian.

72. Defendant and Plaintiff determined the root cause of the Misdirected Payments: Defendant's unauthorized instructions relating to the Mid-Continent Account.

73. The funds were ultimately returned in full to Guardian.

74. Despite this knowledge, Defendant published incendiary language implying terminable misconduct and asset misuse.

75. Defendant published the defamatory statements solely to punish Plaintiff for not providing the money to Defendant upon demand.

76. Defendant acted with malice, knowledge of falsity, and intent to interfere with Plaintiff's economic interests and business relationships.

## CAUSES OF ACTION

### Count 1: Defamation (Libel) Per Se

77. Plaintiff realleges and incorporates by reference all preceding allegations as though restated here.

78. Defendant published the termination explanation to third parties by filing it as part of Plaintiff's Form U5 such that it appears on Plaintiff's publicly accessible registration records.

79. The termination explanation is false and misleading because Plaintiff did not engage in theft, misuse, or dishonest conduct, Plaintiff was unaware of the misdirected deposits until notified

in May 2025, Plaintiff worked to return the funds to Guardian, and the funds were ultimately returned to Guardian in full.

80. The termination explanation is defamatory because it attacks Plaintiff's honesty and integrity and implies misconduct involving theft or misuse of assets, which has injured Plaintiff's reputation and professional standing in the financial services industry.

81. Defendant acted at least negligently regarding the truth of the termination explanation when it filed the Form U5.

82. Defendant made the statements knowing they were false or, at the very least, with reckless disregard for the truth, and the publication of the termination explanation has caused great harm to Plaintiff. Damages are also presumed because Defendant's termination explanation was obviously harmful to Plaintiff professionally and reputationally, constituting defamation *per se*.

83. Defendant knew Plaintiff had nothing to do with the misdirected deposits. Defendants intentionally blamed Plaintiff for serious, fraudulent conduct that he did not do.

84. Before filing this action, demand was made that Defendant retract the termination explanation. No retraction has occurred.

85. Plaintiff seeks actual and punitive damages against Defendant for its conduct.

**Count II: Tortious Interference with Prospective Business Relations**

86. Plaintiff realleges and incorporates by reference all preceding allegations as though restated here.

87. Prior to the Form U5 disclosure, Plaintiff had a reasonable probability of entering into new client relationships and professional affiliations in the financial services industry, and that the public termination disclosure impaired those opportunities.

88. Defendant knew that filing the termination explanation on a Form U5 would foreseeably interfere with Plaintiff's prospective business relationships because the disclosure is publicly visible on registration-record systems used by prospective employers and clients.

89. Defendant's interference was accomplished through independently tortious conduct, including the alleged defamation described in Count I.

90. Defendant's publication proximately caused Plaintiff to lose business opportunities and suffer substantial actual damages, which Plaintiff alleges are at least $5 million.

### Count III: Business Disparagement/Injurious Falsehood

91. Plaintiff realleges and incorporates by reference all preceding allegations as though restated here.

92. Defendant published false and disparaging statements about Plaintiff's business and economic interests by filing the termination explanation that impugns Plaintiff's honesty, integrity, and handling of assets in a regulated profession dependent on trust.

93. The published termination language is false because the misdirected payments were caused by actions attributable to Insgroup and/or The Baldwin Group, Plaintiff lacked knowledge until May 2025, Plaintiff acted to return the funds to Guardian, and the funds were returned in full.

94. Defendant acted with malice because Defendant published the termination explanation despite knowledge of facts Plaintiff contends showed Plaintiff's intent and efforts to return the funds and the circumstances of the misdirection.

95. There exists a lack of privilege (or abuse of any conditional privilege) because the challenged termination explanation was published in a manner that made it publicly accessible and Plaintiff contends it was false and made with improper motive.

96. Plaintiff seeks special damages, including lost revenue and lost business opportunities, and alleges damages of at least $5 million.

## REQUEST FOR INJUNCTIVE RELIEF

97. Plaintiff realleges and incorporates by reference all preceding allegations as though restated here.

98. Plaintiff respectfully requests that this Court grant permanent injunctive relief requiring Defendant to amend, withdraw, and/or correct the Form U5 termination language and to take all steps within Defendant's control necessary to cause removal of the challenged language from Plaintiff's publicly accessible registration records.

99. The continued publication is causing ongoing harm to Plaintiff.

100. There exists a real and immediate threat of continuing injury to Plaintiff because the termination disclosure remains publicly accessible on Plaintiff's registration records unless removed, and the termination language has already impaired and will continue to impair Plaintiff's ability to secure clients and business relationships.

101. Plaintiff respectfully requests injunctive relief narrowly tailored to prevent continued publication of the termination language and to require corrective action by Defendant with respect to its filing.

## JURY DEMAND

102. Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

13

103. Grant Plaintiff compensatory damages against Defendant in an amount to be determined at trial, but no less than $5,000,000, representing economic damages (lost wages and income, future loss of earnings and earning capacity, lost business opportunities, lost revenue) and noneconomic damages (pain and suffering, mental anguish, injury to reputation, and other intangible harms).

104. Grant Plaintiff punitive damages against Defendant as there is clear and convincing evidence that Defendant acted with malice in publishing the false Form U5 allegations.

105. Grant Plaintiff pre-judgment interest on all damages pursuant to from the date of injury (September 17, 2025) until the date of judgment.

106. Grant Plaintiff post-judgment interest on all damages pursuant to from the date of judgment until the judgment is paid in full.

107. Grant Plaintiff costs of this action against Defendant, including expert witness fees.

108. Grant permanent injunctive relief consistent with the request set forth above.

109. Such other and further relief as this Court deems just and proper.


Respectfully submitted,


*/s/ Alan D. Perez*
**Alan D. Perez**
TX Bar No. 24094895
Law Office of Alan D. Perez
2351 W. Northwest Hwy., Suite 1135
Dallas, TX 75220
T: (469) 588-5835
www.alanperezlaw.com